This is a matter where an employee of IGT needed medical leave, was granted medical leave, went out for surgery, and then unforeseen she had a horrible side effect of the surgery, if you will, and she came back without her voice. She lost her voice. She attempted to return to work and IGT said, no, we're not going to let you return to work in your current position. However, there is another position you may be able to work in. What I would like to do at this point in time is state where the analysis goes. This is going to be a hybrid FMLA and ADA case, and so I'm going to spend most of the time on the ADA because I think the FMLA is pretty straightforward, with our main premise being summary judgment was inappropriate in this matter if there was any issue as to whether the interactive process in fact occurred, and we're arguing the interactive process did not occur, as long as Ms. Reza showed a plausible accommodation. That's not her burden of proof to prove there is in fact an accommodation, but to show a plausible accommodation if the interactive process did not occur. Your starting point is, was there an attempt to accommodate her in her original position? Her original position was working as a lead, and that was the title that was given, and I think there may be an issue as to whether she was supervisor or not, but it is a distinct position with, and you can say pretty much a desk job or position, but it is fairly active. Once she returned to work, or attempted to return to work in December of 2004, IGT made the blatant assumption, you can't do this job because you're unable to speak. There was no attempt to accommodate her in her lead position. Did the job description for that position actually require speaking? I thought the description stated that speaking was required. Well, no. There's two portions. The actual description itself did not, but there's a work capacity evaluation form that was later done that did say that once you had check boxes to assist IGT and the plan administrator, I guess, to see if she should be put on disability. But what is interesting is that same work capacity evaluation also stated the job they tried to put her in back in as just a regular tester also required speaking of 75 percent. So that in itself is just a generic work capacity evaluation for many job positions and not specifically this one. But if you look to the actual functions listed, it didn't require speaking. But she herself said that it required speaking 20 percent of the time. Well, and so if you can't do 20 percent of your job, then you can't do 20 percent of your job. Well, here's what it comes down to. Communication obviously is a part of every job, especially when one is in this position. Well, but it's not communication. I hear you, and I thought it was a clever argument in your brief. But it's speaking because she was giving on the job training. She was required to talk over the cell line to others elsewhere in the operation with a good deal of noise and whatever in the facility. Well, granted, that is the way in which she used to do it. And she did say 10 percent, I believe, over the phone, and I forget, 10 percent in another capacity. And you're right, it totaled up to 20 percent. And it was her estimate of what she did do, which was previously speaking. And you're correct. She has to be able to communicate in some fashion. But when she came back in December, there's no dispute, there was no attempt to see what can we do to let you perform your same position. When asked in depositions, it was clearly stated, no, we did not discuss anything with her. Well, it was a blatant assumption, which is the purpose of the ADA to begin with, as well as other discrimination statutes. You can't make an assumption. You have to at least investigate it and look at it. Wait a minute. What was the assumption here, that speaking is required? Yes. Is that the assumption you're challenging? That speaking is required, and no alternative method of communication was possible in this position. So are you saying, you know, you contested in the district court whether speaking was a legitimate requirement of that position? I did, but to be fair and candid, the primary issue was, was there an attempt to accommodate her so she could communicate in a different fashion other than speaking? So the issue of that, the issue was brought up that it was never developed that, in fact, she was required to speak. But, again, in candor. Mr. Wirtz, let me just ask you a purely practical question. I mean, I've read this whole thing. It looks to me as if ITG or ITT, whichever it is, offered her the job she'd had previously, said, well, we'll look at this as you improve. They wanted her as an employee. And this isn't like rocket science. I mean, it's not like having to do some really unusual kind of accommodation. Why can't they just say, look, everybody knows you've got to be able to talk on a cell phone for this lead job? I mean, that's all. You just have to. And why she didn't, she only had a throwaway line at some point about the fact they didn't really think about whether she could do it by computer or whether she could get somebody else to talk for her. I mean, it seems to me kind of obvious that that just wasn't going to work. And so they offer her a job. She says, fine, I'll take it. I'm really ticked about losing the 10 percent. But I'll take the other position. And then she says, but I've also got trouble with smells at the last minute, the day before her leave is to expire. That's not some events were left out of that. I mean, if you look at it overall, that's a relatively fair statement, but you have to look at what led up to that. And so what we need to do is go back to December. And there is a December 3rd letter that she claims she never saw before, because the issue in December 1st and 2nd was she was unable to speak. And again, there was no attempt at dealing with e-mails. She says she works on a computer all the time. There's testimony to that. She stated she walks, she talks to people in person. I mean, communication is necessary. But what you're referring to is jumping from December to March, where according to her impression, that's the first time she was ever offered a transfer. Again, that December 3rd letter, she's stating she's never seen. Okay, I'll take that job, and we'll see how things go. She didn't say that, did she? She did not say she'll take the job. Of course, she discussed many things. But what came out of it, now, this is on March 21st. This is the day she's actually terminated. So within a span of hours, there's an issue that also comes up about her ability to be around chemicals. Now, she uses the word smells. Well, the chemical part was resolved. I mean, her physician said the chemicals that she would be around on the line were okay for her to be around. So that was resolved. And then at the very last second, she says, oh, and by the way, I've got a smells problem, too. And IGT made three efforts, I believe, to contact her doctor. I think she did, too. Made some whatever. Anyway, they couldn't get anything from the doctor with regard to smells. The chemical issues were resolved within IGT's mind, but not within Ms. Reese's. What must be not forgotten is back in December, she had the same work capacity form that said no chemicals. That was never brought up. IGT ignored that and then supposedly saying, okay, we'll put you in this position. But never specifically addressed the chemicals. Then on, I believe, March 16th, IGT is claiming they spoke with a doctor's assistant and says, okay, the chemical issues are resolved. But no one informed Ms. Reese that that occurred. In her mind, she can't be around chemicals. When this is now brought up for the first time to her on the 21st, she says, what do you mean? I can't be around smells. So during this whole period of time, IGT had an opportunity to try to accommodate her, again, from December to March, and there was no discussion about any sort of accommodation. For her, she's now being told, you must be back to work immediately. She was gone a few weeks. We must hear from your doctor immediately. The doctor even wrote IGT saying, you know, three and a half hours to respond is not reasonable. I need more time. She shows up. She has a conversation. And now they're saying, you need to go back to work. This is your position. And she's saying, okay, I dispute this, this, and this, and I've got an issue with smells. And IGT acknowledges she brought up the issue of smells, which, again, I think that's just layperson language saying, you know, I'm having difficulty breathing being around a certain environment. They then decide to investigate that. But they basically put it on her and her doctor to say, you know, you've got to bring us a note from your doctor saying there's an issue. But she was terminated that same day. Again, we're back to the accommodation issue. Had she known that was going to be an issue, she could have brought it up, but she wasn't given that opportunity. What must not be forgotten is when you're dealing with the interactive process and accommodation, it's not accommodating the employer, it's accommodating the employee. She had a nice position. Now she had a life crisis that caused her difficulty. IGT is now saying, okay, we're going to put you in this position. Period. No discussion. What can we do to accommodate you in either position? What can we do to accommodate you if you're having difficulties with smells? What would you desire? I mean, there has to be a real conversation, and that's according to Barnett. Well, why do they have to accommodate smells? I mean, there's what evidence do they have that this is something they need to accommodate? It's her saying I can't breathe in that environment. And, again, it's layperson language, and she's talking about pretty much the caustic fumes she's around. It's not really smells. This one smells sweet. This one smells bitter. It's I can't breathe in this environment. So this is accommodate under which act you're talking about now? This is under the ADA, Your Honor. Under the ADA? ADA. Okay. And so what evidence have they been presented that this is an ADA-qualifying disability requiring accommodation? Well, and it obviously initially started with she can't speak. Okay. We've moved on to smells. When she's presented with this is what you are being offered and this is it, she states I can't be around this environment, and she does use the word smells. Once something is brought up to an employer, it's the employer's obligation and burden to investigate it a little bit. They're the ones with the superior knowledge and, hopefully, you know, superior intellect as compared to possibly just a blue-collar worker. But she has put them on notice I'm having difficulty being in this environment. Again, it's not simply how something smells. She talked about fainting around certain chemicals. I believe it was a hairspray incident. But she had to go to the hospital. It had nothing at all to do with this environment either. But she was saying I have difficulty breathing in certain environments. I'd like to reserve the remaining time for rebuttal.  Thank you, Your Honors. Ms. Jensen. Good morning, Your Honors. I'm Jan Jensen on behalf of International Game Technology, IGT. With me today is Miles Eve, who is also an attorney with IGT. Your Honors have pointed out some of the questions that have troubled me throughout this case. Number one, was verbal communication an essential function of the job? Unquestionably, yes. There was adequate evidence in the record, and Judge Sandoval found that in this environment, a manufacturing environment, loud, things going on very quickly, the need to communicate not only with outside departments, the warehouse, engineering, their own supervisor. A lead had the requirement of dealing with events on the line as they occurred very rapidly face-to-face, including doing on-the-job training. You can't do that any way other than verbal communication. So that's really a non-issue here. Since verbal communication was an essential function of the job, Ms. Risa could not do it. IGT in December offered a reasonable accommodation, let her stay in the production area where she'd spent her entire tenure at IGT, work a station on the line and have periodic reviews. At this time, she was only about three months post-surgery, and in her own mind and in her doctor's mind, there was a recuperation period going on. IGT said, let's put you in this position, let's maintain your job title, let's maintain your pay, and we'll see what happens. She wasn't even required to do what a product tester has to do because her doctor's lifting limitations. So IGT was making an accommodation. At that time, Ms. Risa did not say anything about what about doing something else. She said, I want to be a lead, I want the 10 percent, or I'm not coming back to work. She went to her doctor in December, got another letter, extended her leave until March. Now, putting the burden on the employer to try to figure out what the employee can't. Can I ask a factual question? Absolutely. The position that she was offered and the lead position, are they in the same area involving the same chemicals or smells? Yes, Your Honor. But first I want to clarify, it's IGT's position that a lead is not a position. It is not a job title. It is not something that's guaranteed to anybody. It's based upon the business needs of IGT. Do we need one lead? Do we need two leads? It's interactive. And things change from month to month, year to year. And that lead designation is equivalent to like working a graveyard. You get a 10 percent pay differential for doing different responsibilities. But Ms. Reza always was a product tester. That was her job title. That was her job pay. She was given a 10 percent differential for performing the additional functions of a lead. All right. Well, can we go back? I just, your question. In all your answer, I lost the answer to my question. Absolutely. The lead is right on the line. The same place with the same chemicals and the same smells. Absolutely. The line is like a horseshoe shape. The games come down. Different workers do different things on the machines as they come through. The lead is adjacent, right at the line. There is no separation. There is no office. They are right next to each other. There is no way a lead would not be exposed to the same chemicals, fumes, materials that an assembler or senior assembler or product tester would be. They're right there. In fact, in that entire production area, which is a huge production area, it's over 10,000 square feet. The length of it is just less than two football fields. It's a huge area. There is no separation. Supervisors are exposed to the same thing as the assemblers. Leads are exposed to the same things as assemblers. Warehouse people are exposed to the same things as assemblers. There is no way she can say, I can't sit on the line and do this job, but I can sit at this desk and do the additional lead responsibilities. Can you tell me what happened with this chemical business? When did the doctor lift restrictions on that, and how? In early March, when the IGT six-month leave was to expire, and Ms. Risa was given information at the beginning of her leave, and she knew she had six months. She knew when the expiration of that leave was. About three weeks prior to that, they hadn't heard from her, haven't heard anything about her coming back to work. IGT sends a letter, says, your leave's going to expire. If your condition has changed and you can come back to work, contact us. At this time, apparently, Ms. Risa still couldn't speak. Her sister called and said, yes, she wants to come back to work. We send a work capacity form to the doctor. The doctor sends that back, and at that time, there is the restriction that says chemicals and detergents. There is also a line that says, if you check this box, explain it. Tell us what she can or can't be exposed to. The doctor doesn't fill that out. So IGT calls, and I believe it's on March 16th, talks to the doctor's assistant about the specific things that are in use on the assembly line, which is like a super glue, Loctite glue, and alcohol used for cleaning. Those are the things that are used on the assembly line. Through the doctor's assistant, and there is a note in the record, the doctor's assistant says, yes, I've talked to the doctor. He says those things are okay. We believe that that's good. We can put her back in that environment. She actually agrees to go back in that environment by signing the letter that's dated March 21st. Puts on her notation. She disagrees with the 10 percent differential not being paid to her because she can't speak and can't do the duties of a lead. Agrees to go back to work. Is actually on her way to the production area when she mentions to the manager, Darlene Anderson, what about smells? I can't be around smells. Ms. Risa testified at her deposition, and here's where I disagree with Mr. Moore. She testified at her deposition that IGT was aware that these issues had been addressed with the doctor. She was aware the doctor had told IGT that it was okay for her to be around those chemicals, and she was aware she needed to provide something to the doctor to clarify that limitation. And that's at the supplemental record at page 127. She knew what IGT believed to be her restrictions and that the doctor had approved those things. She raised another issue, and contrary to what Mr. Morris argued, it is the employee's responsibility to clarify those limitations. That's under Allen v. Packbell. When the employee is aware that there are limitations that she believes she has, that the employer has not been advised of, that the employer does not have documentation of, it is the employee's responsibility to get that information to the employer. Here, IGT tried. And when Mr. Morris says she was terminated that day, that's a little inaccurate. Her termination date was effective the 21st, but the decision to terminate was not until the 28th. They waited an extra week waiting for information. Ms. Reason was a good employee, a long-term employee, and they wanted to get her back to work. But you can't put someone back to work when they're going to tell you, I might faint dead away if somebody walks by wearing perfume. They couldn't put her in that situation, which would be a risk to her or other employees. So they did what they could. They called the doctor. They asked Ms. Reason through her sister, because Ms. Reason could not communicate by phone, try to get us this information. Ms. Reason provided nothing. So after a week, the decision was made, we can no longer keep her on. Her six-month leave has expired. We have no option but to terminate her. Let me follow up on Judge Restani's earlier question. Apparently, this inability to tolerate smells is a new condition or a new malady, right? It must be. But what's in the record? You know, when she contracted this disease or whatever it was? Nothing. Your first notice of it? Your first notice was as she was walking down the line saying, by the way, what about smells? Absolutely, Your Honor. They were on their way to the production area when she brought it up for the first time. She claimed that back in February, a month before, she'd had an incident where she walked into the bathroom after her daughter had sprayed some aerosol and fainted dead away, and the paramedics had to come. No medical documentation was ever provided to IGT. No specifications about was it something in that particular spray. Ms. Reza herself said it could be perfume on someone walking by. This area is huge. There are over 300 people working at any one time over three shifts during the day back at that time. IGT cannot control who puts perfume on in the morning, who wears a scented deodorant, who wears hairspray. If that, in fact, was her limitation, she could not work in the production area, and that's what she testified to at her deposition, that her doctor would not let her work in the production area. So if that's the case, IGT has no job for her in the production area, and that is why after the 21st year ---- By the way, that reminds me of another, I don't know if it's an issue or not, or something else. Was there any, either an attempt made by IGT or any request by the employee about some No, Your Honors. There was one more sterile room called the EEPROM room, which was still within the production area, but there were no vacancies in the EEPROM room at that time. That is the only accommodation that Ms. Reza suggested at the time. And this is during a two-to-three-hour conversation with Ms. Reza on the 21st, after she raises this smells issue. But even in the EEPROM room, you can't control what people put on their bodies. Anywhere in the facility, working in the warehouse, working in the shipping area, being exposed to car fumes, gasoline fumes, IGT was never provided any medical documentation of what this limitation was, so that they could even take the first step in trying to accommodate. So the interactive process broke down with Ms. Reza. When she declined or refused to provide any information about this new smells limitation on the very last day of her six-month leave with IGT, that's when it broke down, and IGT's hands were tied. They wanted to bring her back. They thought she was coming back to work. They were on their way to the production area when she put up the roadblock to coming back to work, and never after that day provided IGT with any information regarding this alleged disability. So we submit the district court was correct in granting summary judgment on both the FMLA claim and the ADA claim. There is no material issue, genuine issue of material fact that would necessitate a trial here, and we urge the Court to affirm the district court's decision. Okay. Thank you, Ms. Jensen. Thank you. Mr. Morris. Thank you, Your Honors. Quite a bit to address. Yes, this was a new issue with the smells. How did it come about? She had a tracheotomy for the first time. She said she had difficulty breathing. If you go back to the December work capacity function from the doctor, it says you can't be around chemicals. Same thing in March. Can't be around chemicals. IGT clarified it on March 16th without telling Ms. Rees of this, and Ms. Rees never knew it was an issue she needed to clarify until the 21st. As far as evidence in the record, which I'm now hearing for the first time that she agreed to come back to work, and then she brought the smells that she's working back, walking to her position. She signed the letter. I'm sorry? She signed the letter. We're talking about two things. It was the timing, and the deposition actually said that, and this is in the record, supplemental excerpts to record, page 127. At the time IGT told her she could not be around chemicals, did they also tell you that the – did you also bring up the issue of smells? And she said yes. This wasn't 10 minutes, 15 minutes, half an hour later walking to her position, so to speak. It occurred at that same time. IGT said, okay, we now have a concern. You said you're going to faint on us. We need medical documentation. So within a relatively short span of time, she's being told we need new documentation for something that she thinks has been explained to them the whole time, she can't be around the chemicals. And going back to the interactive process, it is up to the employer to actually bring it up and to discuss possibilities. And I'll mention a resolution here that, of course, she never thought to bring up because IGT never spoke to her about it, respirator. You've got to talk about things, get the employee to start thinking, what can we do? And this is in her declaration. It is in the record. How can we accommodate you? It's not her burden to start saying things to someone else and say, I want this type of accommodation, this type of accommodation. There needs to just be a real conversation. Let's sit down. Okay. Now you're having concerns about this position. What can we do? But it can't be forgotten, her original position was something else. They should try to accommodate her there. Even if she can't do that same position, she did have more of a desk job. She did have more of an elite position. It is a different position. The district court found that counsel's argument not having merit there. There should have been discussion there about moving her to a different location to accommodate her there. And there simply wasn't. I still am kind of hung up on this issue. Here the smells issue is related, and she wants an accommodation. How do we know there's anything? We don't know anything to tell us the smells thing is something that falls under the ADA. What you have is it affects a major life activity, breathing. Wait, wait, wait. I know. Well, certainly if you can't breathe, it would impact a major life activity. But I keep hearing smells. She tells them I can't breathe when there's certain smells around. I didn't get that. She did, and I realize my time's up. But if she would have used a different word, we wouldn't be here. She said I have passed out around certain chemicals. She used the example of Harrisburg. She has stated there's an issue with me breathing. Okay. All right. Okay, Mr. Morris, thank you very much for your argument. Counsel, the matter just argued will be submitted, and the court will be adjourned. All rise. Court is adjourned. Thank you.
judges: Restani, Rymer, Tashima